## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

**MEHDI MOINI,**

                  **Plaintiff,**

**-vs-**
                                       **Case No.  A-10-CA-180-SS**

**UNIVERSITY OF TEXAS AT AUSTIN; WILLIAM C. POWERS, JR. in His Official Capacity as President; STEPHEN F. MARTIN; RICHARD B. QUY, and JENNIFER S. BRODBELT,**

                  **Defendants.**

_____

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendants' Motion to Dismiss ("Mot. Dism.") [#23], Plaintiff Mehdi Moini ("Moini")'s response ("Pl. Resp.") [#24] thereto, and Defendants' reply [#25].  Having reviewed the motions, the relevant case law, and the file as a whole, the Court now enters the following opinion and orders GRANTING Defendants' motion.

## Background

### I.    General Background

Moini claims his former employer, Defendant University of Texas at Austin (the "University"), discriminated against him on the basis of his national origin and age, and in retaliation for making complaints of discrimination.  Moini alleges he worked for the University from December 1998, when he was hired as a "Research Engineer IV," until his employment was apparently terminated through non-renewal of his appointment for the fiscal year beginning September 1, 2008. Second Amended Complaint ("2nd Am. Compl.") [#21] at ¶¶ 14, 45.  According

to Moini, he was given a faculty title in 2001, and also held the positions of Director of Mass Spectrometry, Lecturer, and Senior Research Scientist.  *Id.* at ¶ 14.  Moini alleges he was discriminated against not only by the University as his employer and Defendant Powers as University President, but also individually by Defendants Martin, Quy, and Brodbelt (the "Individual Defendants").[1]  Moini, who is of "Middle Eastern–Iranian" national origin, claims most of the discriminatory acts against him occurred after, and were prompted by, the terrorist attacks against the United States on September 11, 2001.  *Id.* at ¶¶ 8, 51.

## II.     Factual Allegations

## 1.     Defendant Martin

Moini's first allegation against Martin is somewhat confusing, but appears to involve Martin attempting to get Moini fired for "cost overrun" in July, 2004.[2]  2nd Am. Compl. at ¶ 24.  Moini claims upon Martin's promotion to Department Chair in August 2004, Martin established a "Supervisory Committee," overseen by Defendant Brodbelt, that focused on Moini's mass spectrometry unit.  *Id.* at ¶ 27.  When Moini complained about Brodbelt's involvement because

---

[1] The Individual Defendants were allegedly Moini's colleagues in the University's Department of Chemistry and Biochemistry during the times relevant to this suit.  However, Moini's complaint makes it difficult to discern what position each Individual Defendant held at any given time.  According to Moini's complaint: after August 2004, Defendant Martin was allegedly the Department Chair for the Department of Chemistry and Biochemistry at the University; Defendant Quy was "Associate Director"on July 2, 2008; and Defendant Brodbelt was a "Professor," but appears to have had some managerial authority.  Second Amended Complaint [#21] at ¶¶ 47, 45, 15–16, 19, 22.  The Court construes Moini's complaint to allege the Individual Defendants had significant decision-making authority within the Department during the times relevant to this suit.

[2] Specifically, Moini alleges on July 9, 2004, "Moini was called in by Holcomb and Martin and Holcomb attempted to fire Moini accusing him of cost overrun and 'duping' him."  2nd Am. Compl. at ¶ 24.  This allegation is confusing not only for grammatical reasons—was Moini called in by Holcomb, with Martin and Holcomb both attempting to fire him; or called in by Holcomb and Martin, with Holcomb alone attempting to fire Moini—but also because Moini subsequently seems to allege Martin took Moini's side in this dispute.  *Id.*  Holcomb, too, appears to have ultimately taken Moini's side.  *Id.*  Construing Moini's allegations in the light most favorable to him, however, the Court interprets this as an allegation against Martin.

Moini felt Brodbelt was hostile towards him, Martin allegedly "trashed Moini's letter of complaint." *Id.* Moini states Martin and Defendant Quy proposed in October, 2004 to survey the top chemistry departments in the nation to evaluate the relative performance of Moini's unit, but the results were never published. *Id.* at ¶ 28. Moini's team allegedly "conducted the survey and reached the conclusion that their facility was one of the best in the nation in every respect." *Id.* Although Moini does not explicitly spell out his allegation, the implication appears to be Martin and Quy did not publish the favorable results for discriminatory reasons. Moini further claims he complained in 2005 to Martin that his grant money had been "taken over by the department," and Martin subsequently instructed Defendant Quy to replace the funds. *Id.* at ¶ 30. Moini alleges he advised Quy to put $10,000 into his grant money account (apparently called a "30 account"), but Quy put in only $5,500.[3] *Id.* Moini alleges on September 11, 2007, Martin falsely wrote in a draft departmental strategic plan that users of Moini's team's mass spectrometry facility were unhappy. *Id.* at ¶ 32. On September 17, 2007—six days after this alleged incident and three days after Moini allegedly complained to the Departmental Strategic Plan Committee—Martin allegedly removed Moini from an email list, removed his Adjunct Professor title, and removed his faculty voting rights. *Id.* In October 2007, Martin allegedly rejected Moini's application for an open faculty position in the department. *Id.* Moini alleges in 2008, "the Department staged a survey . . . about the performance and capability of the departmental service shops and put Quy in charge of collecting and interpreting the results." *Id.* at 34. Moini's mass spectrometry group allegedly received the lowest score. *Id.* Again, it is not entirely clear who was in charge of this particular "Department" activity, but Moini's

---

[3] Again, it is not clear whether Moini intends this as an allegation against Quy alone, or intends to include Martin in the allegation for his apparent inaction in the face of Quy's wrongful conduct. The Court assumes the latter.

complaint suggests Martin was in charge of the department; thus, the Court construes this as a claim against Martin.  In April 2008, Martin allegedly assembled several faculty members, including Defendant Brodbelt, with the intent to "get rid of" Moini.  *Id.* at ¶ 35.  Martin allegedly used Moini's low ranking in the 2008 "staged" survey as a means of getting rid of Moini.  *Id.* at ¶ 46.  Moini claims the IT group received "about the same score" as his group, but nobody from the IT group "faced any discipline."  *Id.*  Martin and Quy allegedly decided together not to renew Moini's appointment with the University.  *Id.* at ¶ 47.  Finally, Moini alleges Martin provided negative references for him, including a negative reference to a potential employer named "Alcon," for whom Martin was allegedly employed as a consultant.  *Id.* at ¶ 52.

### 2.    Defendant Quy

Moini's allegations against Defendant Quy begin in January 2004, when Quy allegedly referred to Moini as a "loose cannon." *Id.* at ¶ 23.  In July 2004, Quy allegedly colluded with another employee to give Moini a "less than satisfactory" evaluation, writing falsely, "Mehdi has done a generally less than satisfactory job maintaining the facility and upgrading the equipment." *Id.* at ¶ 25.  Moini states in July or August of 2004, Quy took over Moini's "30 account" grant money *Id.* at ¶ 26.  Moini complains of Quy's role, along with Defendant Martin, in the October 2004 proposed survey, the favorable results of which were never published.  *Id.* at ¶ 28.  Moini likewise complains of Quy's reimbursement of only $5,500 into Moini's "30 account".  *Id.* at ¶ 30.  Further, Moini implicitly suggests wrongdoing by Quy for his part in the 2008 "staged" survey, in which Moini's team received the lowest score.  *Id.* at ¶ 34.  Quy allegedly collected and interpreted the results of that survey; and Quy's conclusion was very different from Moini's own informal survey results, which showed his team "had received many compliments." *Id.*  Moini claims from January through

August, 2008, he was "subjected to weekly harassment by Quy in his office with Quy giving Moini a letter of reprimand." *Id.* at ¶ 36. Moini alleges during the meetings there was "a constant clicking noise indicating [Quy] was recording the conversations." *Id.* Moini also makes other allegations about Quy's surveillance of him: Quy and others, including Defendant Brodbelt, allegedly followed Moini and Moini's students during weekly lunch meetings. *Id.* at ¶ 41. Moini claims his students observed Quy in Moini's office area after midnight on one occasion, and after Quy left the students observed "debris on the ground from where [Quy] had moved the ceiling tiles." *Id.* Although Moini does not give dates for these particular events, he begins the paragraph by stating his "activities were monitored starting after 2000 and continuing until the last day he was in the chemistry department," and in the closing of the paragraph he claims, "[a]ll the incidences were reported . . . from 2004 through 2008." *Id.* In July 2008, Quy allegedly informed Moini via letter Moini's appointment as Senior Research Scientist and Director "would not be renewed for the fiscal year beginning September 1, 2008 and he was relieved of his responsibility as the Director of Mass Spectrometry." *Id.* at ¶ 45. Moini complains about Quy's alleged joint decision with Defendant Martin not to renew Moini's appointment, implying their decision was made in retaliation for his complaints against them. *Id.* at ¶ 47. Quy allegedly accused Moini of tampering with equipment as a pretext for firing Moini. *Id.* at ¶ 51. Moini also makes the general claim Quy "constantly harassed him." *Id.* Finally, Quy allegedly also provided negative references for Moini. *Id.* at ¶ 52.

**3.      Defendant Brodbelt**

Moini claims when he began working at the University, he and Defendant Brodbelt "had extensive collaborations." *Id.* at ¶ 15. However, after Moini allegedly witnessed a sexual relationship between Brodbelt and another professor, Moini claims Brodbelt became "very hostile

toward him." *Id.*  Moini allegedly chose to minimize his contact with Brodbelt after this incident, which she used "as an excuse to accuse him of not collaborating with her." *Id.*  Moini claims on two occasions, in 1993 and 1998, he applied for "tenure track positions" in the Chemistry Department, but was denied.  *Id.* at ¶ 16.  Whether Brodbelt was responsible for these denials is unclear from Moini's complaint; however, Brodbelt allegedly at least provided false reasons for his denials.  *Id.* In support of his allegation that Brodbelt provided a false rationale—namely, that Moini was denied the positions because he had entered the department as a staff member—Moini claims the person who ultimately got the job in 1998 had herself entered the department as a staff member.  *Id.* at ¶ 16. Moini's allegations against Brodbelt are not uniformly negative, however: in 2001, Brodbelt allegedly sent a letter of recommendation in support of Moini's appointment to a faculty position. *Id.* at ¶ 18.  However, Moini's complaints against Brodbelt resume in February 2003, when Brodbelt allegedly wrote a letter to Moini in response to Moini's complaint about departmental bias in the hiring process.  *Id.* at ¶ 19.  Although Moini makes no explicit statement about the meaning of Brodbelt's reply, the Court presumes Moini intends it as an allegation of discrimination.[4]  Moini claims in April, 2003, Brodbelt and another employee were following him in the street; in response, for reasons not explained in his complaint, Moini allegedly sent an e-mail to Brodbelt " to ask her if it was okay if he gave a ride to his students." *Id.* at ¶ 21.  Moini alleges in October 2003, he applied for another faculty position at the University, but was not hired.  *Id.* at ¶ 22.  Moini claims he sent an email to Brodbelt, "complaining about bias in her division against his application for tenure track position," and sent copies to both the acting and past Chairs.  *Id.*  Brodbelt allegedly

---

[4] According to Moini, Brodbelt wrote in part, "I suspect that most people in this department would want to hire a new person as opposed to promoting a staff person.  You have to consider this question: what will the department gain by promoting you as opposed to hiring a new person? . . . ."  2nd Am. Compl. at ¶ 19.

replied the department gained nothing by promoting a staff member to a faculty position.  *Id.*  In November 2004, Brodbelt allegedly told Moini about a non-faculty job opening at the University of Nebraska, a comment Moini interpreted as Brodbelt implying Moini should leave the University of Texas.  *Id.* at ¶ 28.  At some unspecified time, but perhaps around September 2006, Brodbelt allegedly wrote a letter of recommendation to the University of New Mexico, stating Moini was not collaborating with her.[5]  *Id.* at ¶ 31.  Moini complains about Brodbelt's alleged involvement in writing the false draft departmental strategic plan on September 11, 2007, and her role as part of the Strategic Planning Committee.  *Id.* at ¶ 32.  As previously noted, Moini alleges Brodbelt was one of the four faculty members, along with Defendant Martin, who conspired to "get rid of" Moini in April, 2008.  *Id.* at ¶ 35.  At another unknown time, but perhaps also around April 2008, Brodbelt allegedly emailed one of Moini's colleagues, telling him, "Moini is under stress," and indicating the colleague should instead work with Brodbelt.  *Id.*  Moini states his replacement was an ex-student of Brodbelt's, and his replacement was not required to give a presentation, as were the other candidates for Moini's position.  *Id.* at ¶ 39.  Although he does not specifically allege it, the Court presumes Moini means to imply favoritism on Brodbelt's part.  Moini also alleges Brodbelt was involved in the continuous monitoring of his activities: Brodbelt allegedly followed Moini on campus; Brodbelt and another colleague  allegedly "monitored his every move," including watching his office and labs; and Brodbelt, Defendant Quy, and a third man allegedly followed Moini and his students during weekly lunch meetings.  *Id.* at ¶ 41.  Moini claims Brodbelt recommended the "staged" survey which was allegedly used as a pretext to not renew his appointment.  *Id.* at ¶ 46.

_____

[5] Moini's allegations appear to be roughly chronological.  This allegation appears at the end of a paragraph; the date listed immediately prior is September 11, 2006.

Finally, Brodbelt allegedly provided negative references for Moini, apparently in addition to the negative reference he claims she provided to the University of New Mexico.  *Id.* at ¶ 52.

4.      **Defendant Powers and the University**

Moini makes relatively few allegations against the University by name, and none directly against Defendant Powers.  Thus, the Court recites all allegations Moini might plausibly have intended against the University, excluding those made specifically against the Individual Defendants. In 2000, the outgoing chairman of the Chemistry Department allegedly asked everybody to pray; Moini allegedly complained about the incident to the new chairman.  *Id.* at ¶ 17.  As previously mentioned, Moini was allegedly turned down for a faculty position at the University.  *Id.* at ¶ 22. In December 2004, Moini's name and web page were allegedly removed from the University faculty list, and he was removed from the distribution list for faculty meetings.  *Id.* at ¶ 29.  Moini claims in 2005 his grant money was appropriated by his department.  *Id.* at ¶ 30.  In December 2005, Moini allegedly met with the University ombudsman to complain about Defendant Brodbelt "taking over his job," and was referred to a University attorney.  *Id.* at ¶ 31.  Moini claims although the attorney indicated he would investigate and provide Moini a formal report, this never happened.  *Id.*  Moini further claims he complained about discriminatory hiring practices to the External Advisory Committee of the University Chemistry Department.  *Id.*  Although a report was allegedly released, Moini makes no mention of its substance.  *Id.*  Moini alleges he filed a formal complaint with the University's Equal Employment Office on October 3, 2007.  *Id.* at ¶ 32.  At some point after that, Moini claims, his "titles of Lecturer and Adjunct Faculty were removed and he was not considered for an in-line promotion to Adjunct Professor or to Research Professor."  *Id.*  By contrast, Moini alleges, a non-Middle Eastern faculty member did receive her in-line promotion to Research

-8-

Professor, although her title was changed—allegedly after Moini filed his complaint—to "Research Scientist". *Id.* In 2007, the Chemistry Department allegedly falsely accused Moini of modifying an instrument. *Id.* at ¶ 33. Moini claims he complained in 2008 to a Dean about Defendant Quy's alleged harassment of Moini, but the Dean "denied Moini's charges." *Id.* at ¶ 37. In July 2008, after receiving his first letter of non-renewal, Moini allegedly filed a retaliation complaint with the University's Equal Employment Office and with the University ombudsman. *Id.* Moini claims these entities conducted an investigation and "concluded that the claim that Moini had not collaborated with faculty was wrong." *Id.* Subsequently, Moini alleges, the department withdrew the first letter and issued a second, the latter containing no "reason" for his non-renewal. *Id.* Moini claims he complained to the Faculty Grievance Committee, but the University Provost stopped the investigation of Moini's claims because Moini was not a member of the faculty. *Id.* Moini states he was, in fact, a member of the faculty. *Id.* Moini further asserts the University's Equal Employment Office conducted an unfair investigation because it, among other things, intimidated witnesses. *Id.* at ¶ 38. As noted above, Moini complains his replacement was given unfair favorable treatment during the interview process. *Id.* at ¶ 39. Immediately after September 11, 2001, a police officer allegedly patrolled the corridor where Moini worked. *Id.* at ¶ 41. Moini claims he "applied for a Professor's position in 1999, 2003, 2005–2007 and was not selected for any of the positions although better qualified than those who were interviewed and/or hired." *Id.* at ¶ 42. He further alleges the reasons given about why he was not selected were false. *Id.* at ¶¶ 42, 44, 46. Moini allegedly applied for, but did not receive interviews for, four positions in the Analytical Chemistry Division of the Department of Chemistry and Biochemistry between 1993 and 2008. *Id.* at ¶ 43. Moini claims "the department systematically gave Moini lower raises compared with people with

similar or less [sic] accomplishments." *Id.* at ¶ 44.   On April 10, 2008, Moini's internal

discrimination complaint investigation allegedly concluded with no finding of discrimination. *Id.*

at ¶ 45.   On July 2, 2008, Moini allegedly received a letter from Defendant Quy, stating Moini's

appointment would not be renewed for the next fiscal year, and Moini was removed as Director of

Mass Spectrometry. *Id.*   Moini alleges his replacement as Director of Mass Spectrometry was

"significantly younger" than Moini, less qualified, and not of Middle Eastern–Iranian origin. *Id.* at

¶ 48, 50.   On March 25, 2008, Moini was allegedly denied a faculty position in the Chemistry and

Biochemistry Department. *Id.* at ¶ 49.   Finally, Moini claims he was "eliminated from security

briefings" and "subjected to an email of a faculty member about a strange visitor from Iran (an

Iranian scientist)," in the wake of the September 11, 2001 terrorist attacks on the United States. *Id.*

at ¶ 51.

## III.   Procedural Background

Moini brings four causes of action in his second amended complaint: (1) a Title VII claim

against the University for national origin discrimination and retaliation, in violation of 42 U.S.C. §§

2000e–2000e-17; (2) a claim against the Individual Defendants for depriving him of equal rights

under the law, in violation of 42 U.S.C. § 1981; (3) an Age Discrimination in Employment Act claim

against the University and Powers seeking prospective equitable relief, under 29 U.S.C. §§ 621–634;

and (4) a claim against the Individual Defendants for violation of his rights under the United States

Constitution and both state and federal law, in violation of 42 U.S.C. § 1983.

On October 7, 2010, this Court granted in part and denied in part Defendants' motion for

judgment on the pleadings based on Moini's original complaint.   Order [#20] at 18–20.   The Court

found a 300-day limitation period applied to Moini's Title VII claim (substantially the same claim

he asserts in his second amended complaint), rejecting both the Defendants' argument that an 180-day limitation period should apply, and Moini's "continuing violations" argument. *Id.* at 6, 11. Further, the Court dismissed with prejudice Moini's § 1981 claim against the University because of the University's Eleventh Amendment immunity. *Id.* at 11–13. The Court declined to dismiss Moini's ADEA claim, but only to the extent he asserted it against Powers (rather than the University) and sought only prospective equitable relief. *Id.* at 14. Finally, the Court dismissed with prejudice Moini's § 1983 claim against the University on the basis of its Eleventh Amendment immunity; and dismissed without prejudice his § 1983 claim against the Individual Defendants on the basis of their qualified immunity. *Id.* at 14–18.

Moini filed his second amended complaint on October 15, 2010. Although he has restated and expanded upon some of his prior allegations, his factual pleadings are similar to those contained in his original complaint. The causes of action in Moini's second amended complaint are also similar, except he now asserts a § 1981 claim against the Individual Defendants, and clarifies he is seeking only prospective equitable relief in his ADEA claim. It appears Moini's main goal in filing his second amended complaint was to allege a set of facts that would establish a "continuing violation," such that he could defeat the statutes of limitations applicable to his discrimination claims;[6] and allege facts sufficient to defeat the Individual Defendants' qualified immunity.

Defendants have filed a motion to dismiss Moini's second amended complaint under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. Defendants do not challenge Moini's ADEA claim against Powers, to the extent he seeks prospective equitable relief; nor his Title VII

---

[6] "The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Messer v. Meno*, 130 F.3d 130, 134–35 (5th Cir. 1997).

claims based on acts that occurred on or after September 15, 2007.  Mot. Dism. at 10.  However, Defendants ask the Court to (1) find Moini has not alleged a continuing violation; (2) dismiss Moini's § 1981 claim against the Individual Defendants; and (3) dismiss Moini's § 1983 claim against the Individual Defendants on the basis of their qualified immunity.  For the following reasons, the Court now GRANTS Defendants' motion.

**Analysis**

**I.      § 1981 Claim**

The Court quickly disposes of issue (2).  Both parties agree Moini's § 1981 claims against state actors must be pursued through § 1983.  Mot. Dism. at 6; Pl. Resp. at 5.  Simply put, although Moini's rights may be guaranteed by § 1981, his cause of action against the Individual Defendants is under § 1983.[7]   *See Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 463 (5th Cir. 2001) ("[P]laintiffs must assert a cause of action against state actors under § 1983 to remedy violations of civil rights under § 1981.").  It is not clear whether the parties actually substantively disagree on this issue, but Moini specified his § 1981 claim as a separate cause of action, *see* 2nd Am. Compl. at ¶¶ 57–59, and Defendants are correct he cannot do so.  Therefore, with the understanding Moini properly asserted his § 1981 rights via his § 1983 claim, the Court GRANTS Defendants' motion and DISMISSES WITH PREJUDICE Moini's separate § 1981 claim against the Individual Defendants.

_____

[7] Moini does not dispute the Individual Defendants are state actors.

**II.      Motion to Dismiss [#23]**

**1.      12(b)(6) Motion to Dismiss – Legal Standard**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).   A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).   In deciding a motion to dismiss under 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164 (1993).   However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).   Further, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.   Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," that must be performed in light of a court's "judicial experience and common sense." *Id.* at 1950.

2.       **Continuing Violation**

Defendants argue Moini has failed to allege a series of related acts such that they constitute a single continuing violation of federal law, rather than a series of discrete acts. Therefore, Defendants argue, Moini cannot defeat the statutes of limitations applicable to his discrimination claims. The Court agrees with Defendants.

"[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). However, as noted above, "[t]he continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Messer v. Meno*, 130 F.3d 130, 134–35 (5th Cir. 1997). The Court must therefore decide whether Moini has alleged numerous discrete, but related, acts; or a series of acts sufficiently related to constitute a single "continuing violation." The Court finds the former.

a.       *Glass* **and** *Morgan*

The test for determining what constitutes a continuing violation in the Fifth Circuit is not entirely clear. In *Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554 (5th Cir. 1985), the Fifth Circuit held a plaintiff could establish a continuing violation if he or she established: (1) some "independent actionable conduct" occurred within the statutory period; and (2) the plaintiff filed a charge within the statutory period after he or she knew, or reasonably should have known, time-barred conduct was itself actionable. *Glass*, 757 F.2d at 1561. The *Glass* court explained: "The core idea . . . is that '[e]quitable considerations may very well require that the filing periods not begin to run until facts supportive of a Title VII charge or civil rights action are or should be apparent to a reasonably

-14-

prudent person similarly situated.'" *Id.* at 1560 (quoting *Dumas v. Town of Mount Vernon*, 612 F.2d 974, 978 (5th Cir. 1980)).

However, the Supreme Court's decision in *Morgan*, *supra*, "clarified the limits of the continuing violations doctrine." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004).  In *Morgan*, the Supreme Court indicated close adherence to Title VII's statutory text was proper, and equitable tolling doctrines—such as the continuing violations doctrine—should be "applied sparingly." *Morgan*, 536 U.S. at 113.  The Court seemed to divide Title VII claims into three categories: those based on discrete acts, which are actionable only if an individual act falls within the limitations period; those based on a single, continuing, hostile work environment claim, for which all acts composing the hostile work environment are actionable, provided at least one constituent act falls within the limitations period; and those based on "pattern-or-practice" claims, which the Court declined to address.  *Id.* at 114–18 & 115 n.9; *see Pegram*, 361 F.3d at 279 ("In contrast to discrete acts, the Court carved out an exception for claims based on a hostile work environment.").

*Morgan* potentially conflicts with Fifth Circuit precedent in two ways.  First, the Supreme Court specifically listed "termination, failure to promote, denial of transfer, or refusal to hire" as "discrete acts," and held such acts were only actionable if they occurred within the statutory period. *Id.* at 114.  By contrast, the Fifth Circuit has stated, "our circuit jurisprudence has noted that prohibited employment discrimination in promotion and transfer may often be a continuing violation."[8]  *Glass*, 757 F.2d at 1561.

---

[8] These two statements are obviously in conflict.  However, the Fifth Circuit justified its precedent by reference to equitable considerations, the "core idea" behind the continuing violations doctrine: "A persisting and continuing system of discriminatory practices in promotion or transfer produces effects that may not manifest themselves as

The second potential conflict between *Morgan* and Fifth Circuit precedent has to do with the viability of the *Glass* test for a continuing violation. In *Morgan*, the Supreme Court helpfully clarified: "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Morgan*, 536 U.S. at 110. Further, the Court went on to say a plaintiff can only "file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.* at 114. The Court acknowledged, however, defining the term "appropriate time period" may not be straightforward in all cases: "One issue that may arise in such circumstances is whether the time begins to run when the injury occurs as opposed to when the injury reasonably should have been discovered." *Id.* at 114 n.7. The Court declined to address that issue. *Id.*

The continuing violations doctrine is an equitable doctrine, and *Morgan* explicitly stated it did not preclude the application of equitable doctrines—although it properly advised they be applied sparingly. Thus, a narrow reading of *Morgan* suggests it is not necessarily in conflict with either Fifth Circuit precedent or the *Glass* test.[9] The Court need not definitively resolve this issue, however, as Moini does not meet either requirement.

The Court easily concludes Moini did not satisfy the *Glass* test because he clearly knew or should have known Defendants' alleged conduct was actionable. Indeed, according to Moini, he lodged numerous formal and informal complaints about discrimination and bias, dating back to at

---

individually discriminatory except in cumulation over a period of time." *Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1561 (5th Cir. 1985). And, although *Morgan* indicated such equitable doctrines should be "applied sparingly," it explicitly stated nothing in the opinion "preclude[d] a court from applying equitable doctrines that may toll or limit the time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

[9] The Fifth Circuit seems to have adopted a more broad reading of *Morgan*, however: "Under *Morgan*, discrete acts such as failure to train and refused admission to an MBA program, which are separately actionable, may not be pursued outside the relevant limitations period." *Pegram v. Honeywell*, 361 F.3d 272, 280 (5th Cir. 2004).

least 2000.  *See* 2nd Am. Compl. at ¶¶ 17, 19, 22, 24, 31–32, 37.  He is therefore not entitled to equitable tolling under *Glass*.

**b.**     **Hostile Work Environment**

The more difficult question is whether Moini has sufficiently alleged a hostile work environment claim.  Although Moini has alleged many discriminatory acts over a substantial period of time, the Court concludes they fall short of alleging a hostile work environment.

**i.**     **Legal Standard**

"A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *Morgan*, 536 U.S. at 117.  For a series of acts to create a hostile work environment, they must be serious enough to affect a term, condition, or privilege of the plaintiff's employment. *Celestine v. Petroleos de Venezuella*, 266 F.3d 343, 353 (5th Cir. 2001).  Further, the harassing acts must be based on a legally protected characteristic of the victim.  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002).  A hostile work environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Morgan*, 536 U.S. at 116 (citations omitted).  "In determining whether an actionable hostile work environment claim exists, we look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (quotation omitted).

**ii.      Application**

Moini has failed to sufficiently allege a hostile work environment.  Because this is a motion to dismiss, the Court must accept as true all of Moini's specific factual allegations.  However, as noted above, the Court need not give credit to conclusory allegations, nor legal conclusions masquerading as factual allegations.  The Court begins its analysis of Moini's relevant allegations by identifying those the Court need not credit and removing them from consideration.

**A.      Deficient Allegations**

First, Moini's complaint contains many conclusory allegations the Court need not accept as true.  For instance, Moini states Defendant Quy "continuously harassed" him, but provides no specific facts in support.  2nd Am. Compl. at ¶ 51.  In the absence of specific facts, this allegation is simply an unsupported conclusion.

Second, many of Moini's allegations, most notably his claims relating to Defendants' alleged surveillance of him, are based on speculation and conjecture.  For instance, Moini allegedly heard noises above his classroom "as though a recording device had been left on, as well as noise from the zooming of a camera." *Id.* at ¶ 41.  But Moini never directly observed any recording equipment, nor do the nature of his allegations—unusual sounds of uncertain origin—point strongly to that conclusion.  This Court must interpret Moini's allegations in the light most favorable to him, but it is not authorized to join him in unsupported speculation.

Finally, Moini alleges some acts the Court declines to attribute to Defendants.  For instance, Moini alleges documents disappeared from his office and files were deleted from his work computer. *Id.* at ¶ 26.  While the Court accepts this allegation as true, as it must, it cannot simply infer Defendants were to blame.  Moini does not allege his office was accessible only by Defendants;

indeed, he alleges his students had access to his "office area."  *Id.* at ¶ 41. Moini further alleges on

one occasion, "an unmarked car with four middle aged men were waiting at Moini's house."  *Id.*

Moini does not allege the men were associated with the University, that any of the Individual

Defendants were among them, or any other fact pointing toward Defendants.  Absent a plausible

reason to do so, the Court refuses to hold Defendants responsible for all of Moini's unattributed

allegations.

**B.    Remaining Allegations**

Of Moini's remaining allegations, he specifically identifies the following as supporting his

hostile work environment claim: Brodbelt followed Moini on the streets of the UT campus; Moini's

"30 account" was taken over and the funds only partially reimbursed; Moini was not promoted

because he did not have a research account; there was a lack of diversity in his Department between

2006 and 2008; Moini was not promoted while non-Middle Eastern employees were; Quy was in

Moini's office area late at night; Brodbelt and Quy followed Moini and Moini's students during

weekly lunches; a police officer patrolled Moini's hallway; Moini systematically received lower

raises than less accomplished employees; Moini was excluded from security briefings; and Quy

accused Moini of tampering with equipment.  Pl. Resp. at 3–4.  Moini summarizes:

> Being followed, monitored in the department, having work and files disappear,
> having a police officer posted in his corridor at work, being accused of wrongdoing,
> generally harassed, being subjected to no diversity in his department during his
> employment and receiving lower raises throughout his employment, shows a "series
> of related acts" by the same actor–the individual defendants.

*Id.* at 4.  As previously noted, some of these allegations—namely, "having work and files disappear,"

and being "generally harassed"—are deficient and the Court gives them no weight.  Others, such as

systematic denial of raises and lack of promotion, are discrete acts that do not substantially contribute to a workplace permeated with discriminatory intimidation, ridicule, and insult.[10]  *See Morgan*, 536 U.S. at 114 ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.").  Finally, and most significantly, many of Moini's allegations, such as Quy calling him a "loose cannon"; Brodbelt's letter asking him to consider what the department gained by hiring from within; and the posting of a police officer near Moini's office, do not appear to have been motivated by an illegal discriminatory purpose, despite Moini's conclusory suggestion to the contrary.  Absent objective factual support, a plaintiff's subjective belief of discrimination is not sufficient to establish a hostile work environment.  *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001).

The allegations most relevant to the existence of a hostile work environment are those related to Moini being followed and spied upon.  The Court acknowledges intimidation can be both overt and subtle, and being followed by one's coworkers may be unpleasant.  However, Moini has the burden to allege specific facts, not broad generalizations.  Thus, the Court cannot credit such vague allegations as: "Moini was under continuous surveillance in his office, labs, streets and even at home," or "Holcomb and Brodbelt monitored his every move."  2nd Am. Compl. at ¶ 41.  And, as previously explained, many of Moini's other allegations related to surveillance are deficient.

The Court finds Moini's allegations of being followed by coworkers are not sufficient, alone or in combination with his other allegations, to plausibly allege the existence of a workplace

---

[10] The Court does not agree discrete acts can never be considered in the context of a hostile work environment claim, as Defendants argue.  Mot. Dism. at 4–5.  However, in light of *Morgan*'s apparent division of discriminatory practices into "discrete acts" and "hostile work environments," the Court acknowledges allegations of discrete acts are generally entitled to little or no weight in the analysis.

"permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Morgan*, 536 U.S. at 116 (citations omitted).  The alleged surveillance, while probably unsettling, does not appear to have been physically threatening or humiliating, nor did it seem to unreasonably interfere with Moini's work performance.[11]  Additionally, none of the facts alleged suggest the surveillance was motivated by discrimination against Moini's national origin or age, or conducted in retaliation for his complaints.  The Court thus concludes Moini has failed to allege a hostile work environment.

### iii.    Conclusion

Because Moini has failed to satisfy the *Glass* test, and has not sufficiently alleged a hostile work environment, he is not entitled to equitable tolling under the continuing violations doctrine. The Court therefore GRANTS Defendants' motion on this issue.  Moini's claims of discrimination must be based on acts that occurred within the statutory period for each cause of action.[12]

### 3.    Qualified Immunity

Defendants argue the Court should dismiss Moini's § 1983 claims against the Individual Defendants because Moini has failed to allege sufficient facts to defeat the Individual Defendants' qualified immunity.  The Court agrees.

---

[11] Moini does not allege Defendants Brodbelt or Quy acted in a threatening or insulting manner, merely that they followed him.

[12] Of course, nothing prevents Moini from introducing evidence of prior acts as background for his timely claims.  *Morgan*, 536 U.S. at 113.

a.      **Legal Standard**

Qualified immunity "shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1945 (2009). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009). The Supreme Court has articulated a two-part test for resolving government actors' claims of qualified immunity: a court must determine both (1) whether the plaintiff has sufficient alleged a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the actor's alleged misconduct. *Id.* at 815–16. Although the Supreme Court once required these questions be answered in order, and doing so is still often advisable, courts have discretion to address either question first. *Id.* at 818.

With respect to question (1), "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S.Ct. at 1948. Moreover, "to state a claim based on a violation of a clearly established right, [a plaintiff] must plead sufficient factual matter to show [a defendant] adopted and implemented the . . . policies at issue not for a neutral . . . reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 1948–49; *see Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997) ("In order to state a claim of racial discrimination under the Equal Protection Clause and § 1983, a plaintiff must demonstrate that the governmental official was motivated by intentional discrimination on the basis of race."). With respect to question (2), a government actor is entitled to qualified immunity unless a reasonable

official would have been on notice the conduct was unlawful. *Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009). However, a government official is unlikely to be protected by the second prong of the inquiry if the plaintiff meets his or her burden under the first, because objectively reasonable officials know intentional discrimination on the basis of race or national origin is illegal. *See, e.g.*, *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1181 (5th Cir. 1998) ("A reasonable person would be aware that national origin discrimination violates well established rights.").

**b.   Application**

Moini has failed to sufficiently allege a violation of his constitutional rights. Indeed, his brief barely addresses the issue, simply stating: "The laws cited by Moini set forth clearly established rights of employees, thus we move to the second inquiry as to whether or not the defendants' conduct was objectively reasonable." Pl. Resp. at ¶ 2. The question, however, is not whether Moini has identified laws that clearly establish a set of rights. The question is whether Moini has, separately for each Individual Defendant, alleged a set of facts sufficient to establish a *violation* of *his* rights. In particular, Moini must demonstrate each Individual Defendant acted against him for the purpose of discriminating against him on the basis of his race, national origin, or other illegal classification. The Court concludes Moini has not done so.

Moini has alleged facts that, viewed in the light most favorable to him, demonstrate he was treated differently than other employees. However, his conclusion this disparate treatment was based on his race, national origin, age, or in retaliation for protected activity, is conclusory. The Fifth Circuit has long held, "plaintiffs who invoke § 1983 must plead specific facts that, if proved, would overcome the individual defendant's immunity defense; complaints containing conclusory allegations, absent reference to material facts, will not survive motions to dismiss." *Geter v.*

*Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988).  Moini's allegations against the Individual Defendants, catalogued above, are bereft of any specific facts giving rise to a plausible inference of illegal discrimination.  Indeed, Moini concedes at the outset of his complaint Defendant Brodbelt, at least, had a reason to dislike Moini unrelated to Moini's race, national origin, or age—namely, Moini allegedly witnessed a sexual relationship between her and another professor.  2nd Am. Compl. at ¶ 15.

Although the inference of illegal discriminatory motivation is not plausible because Moini has failed to allege specific facts in support of it, it is further weakened by: Moini's allegation Brodbelt supported his appointment to a faculty position; Martin's apparent support of Moini when Holcomb accused Moini of "cost overrun"; Martin's directing Quy to return funds to Moini's "30 account"; and the lack of any allegations of conduct or remarks explicitly aimed at Moini's race, national origin, or age.   Further, as Defendants point out, Moini alleges many acts against the Individual Defendants that appear consistent with the proper performance of their duties as employees of the University.  Seemingly neutral performance of job functions can, under some circumstances, serve to hide a discriminatory motive.  But here, as in *Iqbal*, Moini's complaint "does not contain any factual allegation sufficient to plausibly suggest [defendants'] discriminatory state of mind." *Iqbal*, 129 S.Ct. at 1952.

**c.     Conclusion**

*Twombly* and *Iqbal* require Moini to make allegations sufficient to plausibly state a claim; he has not done so here.  The Court therefore concludes Moini has failed to state a § 1983 claim against the Individual Defendants sufficient to defeat their qualified immunity.  Consequently, the Court GRANTS Defendants' motion on this issue.  Because the Court has already given Moini a

chance to amend his complaint to state § 1983 claims against the Individual Defendants, the Court

now DISMISSES those claims WITH PREJUDICE.

### Conclusion

Because § 1983 is the exclusive remedy for violations of § 1981 by state actors, Moini cannot

maintain a separate § 1981 claim against the Individual Defendants.  The Court therefore

DISMISSES WITH PREJUDICE Moini's § 1981 claim.  Moreover, Moini has failed to state a

plausible § 1983 claim against the Individual Defendants in light of their qualified immunity, despite

having had an opportunity to amend his complaint.  Accordingly, the Court DISMISSES WITH

PREJUDICE Moini's § 1983 claims against the Individual Defendants.  Finally, the Court concludes

Moini is not entitled to equitable tolling under the continuing violations doctrine; he is therefore

bound by the appropriate limitations periods for his claims.  Because the Court has already given

Moini an opportunity to amend his complaint, the Court now DISMISSES WITH PREJUDICE the

untimely claims.[13]

Accordingly,

IT IS ORDERED that Plaintiff Mehdi Moini's § 1981 and § 1983 claims against

Defendants Martin, Quy, and Brodbelt; and Moini's Title VII claims based on conduct prior

to September 15, 2007, are DISMISSED WITH PREJUDICE;

SIGNED this the 10th day of January 2011.

SAM SPARKS
UNITED STATES DISTRICT JUDGE

---

[13] After the Court's order, Moini retains an ADEA claim against Defendant Powers for prospective injunctive relief; and a Title VII claim against the University for national origin discrimination and retaliation, for acts that occurred on or after September 15, 2007.